|tEZELL, J.,
dissenting.
I dissent from the majority opinion because I find that Brenda’s husband Gerard, did in fact have the right to consent to a hysterectomy on Brenda’s behalf pursuant to La.R.S. 40:1299.53. I recognize that La.R.S. 40:1299.51 provides that this provision of the Louisiana Medical Consent Law does not apply to the subjects of abortion and sterilization. However, I find that no sterilization procedure was performed in this case.
Dr. Jurgelsky testified extensively regarding her decision that a hysterectomy was warranted in this case, which was not for the purpose of sterilization but due to the possibility of hemorrhage and potential serious future complications. She explained that once she noted fatty tissue during the D & C procedure, she was required to open the abdomen to explore the possibility that Brenda may now be bleeding internally. She stated that Brenda was not a good candidate for laparosco-py to repair the perforation and to explore for other problems because she had two previous c-sections with the potential risk of scar tissue formation, making a laparo-scopic procedure difficult. Dr. Jurgelsky deemed it necessary to perform a hysterectomy because she did not feel that nature could rid the uterus of the fetal | gproducts because they had already been there for a long period. She opined that Brenda was at risk of hemorrhaging when the body attempted to rid itself of the retained fetal products. It was at this point that Dr. Jurgelsky left the operating room to explain the situation to Brenda’s husband Gerard.
Dr. Jurgelsky testified that she told Gerard about the perforation of the uterus, which was listed as a risk of this surgery on the consent form, and all other doctors who testified agreed that it does happen on occasion with this type of procedure. She explained that there were two options, repairing the uterus or performing a hysterectomy. Dr. Jurgelsky further told Gerard that the D & C procedure on Brenda had been a very complicated one because the fetal products were so enmeshed in the lining of the uterus that she had a hard time removing them and could not even get all of it. She told him that she was concerned that if she repaired the uterus and left the remaining fetal products that she could not remove, that there was a possibility that Brenda could eventually bleed to death when the body naturally tries to get rid of this tissue, as it will continue to bleed when the tissue stays stuck. Dr. Jurgelsky also explained to Gerard that she and Brenda had discussions about Brenda having problematic periods and that she did not want to have any more children and that she knew he did not want to have a vasectomy. Gerard told her to do what she thought was best. He then signed a consent form for a hys *918 terectomy which listed injury to the ureter and leakage of urine through the vagina as possible risks.
There is no definition in the law of “sterilization.” As can be seen from the following medical definitions, tubal ligations are the most often used form of sterilization in a female. Hysterectomies are most often performed for purposes of medical treatment and not sterilization.
18 TABER’S CYCLOPEDIC MEDICAL DICTIONARY 1831 (1997), defines 1 ¡/‘sterilization” as:
2. The process of rendering barren. This can be accomplished by the surgical removal of the testes or ovaries (castration) or inactivation by irradiation, or by tying off or removing a portion of the reproductive ducts (ductus deferens or uterine tubes). SEE: salpingectomy; tubal ligation; vasectomy.
Hysterectomy is defined as the “[sjurgical removal of the uterus through the abdominal wall or vagina. The presence of benign or malignant tumors is the most frequent reason for hysterectomy.” Id. at 953.
The purpose of the hysterectomy in this case was for medical treatment and not sterilization. Dr. Jurgelsky deemed a hysterectomy necessary to prevent complications given Brenda’s past medical history and the complications that arose during the D & C procedure. I do not agree with the majority that Dr. Jurgelsky’s purpose in performing the operation is relevant only if she was faced with an emergency situation. Section 40:1299.53(A) does not require that an emergency be present for a spouse to consent, only that it be “suggested, recommended, prescribed, or directed by a duly licensed physician.... ” The evidence is clear that Dr. Jurgelsky considered all circumstances and found that a hysterectomy was medically appropriate under the circumstances. For these reasons, I find that Gerard could consent to the hysterectomy.
The Thibodeauxs also complained that the trial court erred in finding that Dr. Jurgelsky did not breach the standard of care in her performance of the hysterectomy. I find that the testimony and medical evidence in the record support the trial court’s determination that Dr. Jurgelsky did not breach the standard of medical care in performing a hysterectomy on Brenda.
A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. A physician is not required to exercise the highest degree of care possible; rather, his duty |4is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor’s treatment fell below the standard of care expected of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained.
Fusilier v. Dauterive, 00-151, p. 7 (La.7/14/00), 764 So.2d 74, 79 (citations omitted).
One of the three doctors on the medical review panel opined that Dr. Jurgelsky deviated from the standard of care because there were other options short of a hysterectomy that should have been considered. Dr. Felton Winfield, an OB/GYN, testified that he would have completed the procedure, made sure the patient was stable, and repair the damage. He would have examined Brenda laparoscopieally to see if there was damage to other structures. *919 Dr. Winfield stated that he would not perform a hysterectomy even if he did not think all fetal products were removed because most products are passed with bleeding afterwards.
Dr. Jose Dora, another OB/GYN, also served on the medical review panel but found that Dr. Jurgelsky did not breach the standard of care in this case. Dr. Dora testified that repairing the tear and leaving the fetal products left too many potential complications, including infection, bleeding, disseminated intra vascular coagulation, postoperative complications with peritonitis, sepsis, and life threatening fevers. He stated that knowing the facts of this case, including possible contraception, he would have proceeded with a hysterectomy. It was his opinion that given Brenda’s medical history, discussions of possible contraception, advanced maternal age of thirty-seven years, and the fact that the abdomen had to be opened to check for involvement of other structures from the tear, he would have probably performed a hysterectomy. He opined that a hysterectomy was the best option for this particular patient.
Dr. Thomas Nolan, an OB/GYN professor at Louisiana State University | ¡¡Medical Center, testified as an expert on Dr. Jur-gelsky’s behalf. He opined that Dr. Jur-gelsky’s care was appropriate. He agreed that additional surgery was appropriate to make certain the bowel had not been perforated. Dr. Nolan believed that a hysterectomy was appropriate based on discussions that Dr. Jurgelsky and Brenda had during the course of treatment. He also considered the fact that Brenda was already opened up which increased the risk for infection. She was also a high-risk patient due to her heavy weight, which could cause future menstrual problems in addition to the fact that the potential for endometrial cancer was slightly increased. It was his opinion that Dr. Jurgelsky was not guilty of malpractice.
For these reasons I would affirm the decision of the trial court.